**Sarah E. HENRY, Plaintiff,**

v.

**AUCHINCLOSS, PARKER & REDPATH, Defendants.**

**Civ. A. No. 2914-59.**

United States District Court
District of Columbia.

April 17, 1961.

E. W. Mollohan, Jr., and Donald S. Caruthers, Washington, D. C., for plaintiff.

Preston C. King, Jr., and Edgar T. Bellinger, Washington, D. C., for defendants.

HOLTZOFF, District Judge.

This is an action for the conversion of certain securities owned by the plaintiff. The matter is now before the Court on a motion for a directed verdict made by the defendants at the close of the entire case.

The plaintiff in this action, Sarah E. Henry, is an estimable elderly lady one hundred years old. The defendants are members of a stock brokerage and investment firm. The plaintiff contends that certain securities belonging to her were wrongfully delivered to the defendants by one of her sons, and that the defendants wrongfully sold those securities. The defense is that the son was clothed with indicia of apparent or ostensible authority, on which the defendants had a right to rely, that they relied upon them in good faith and sold the securities by the direction of the son and remitted the proceeds to the plaintiff.

There are certain facts that are in dispute and the Court will not refer to them because on such a motion as that presented here the facts must be considered most favorably from the standpoint of the plaintiff. The undisputed facts, however, are sufficient to warrant the Court in directing a verdict in favor of the defendants, without regard to the other contested issues.

The salient facts in this case are as follows. The plaintiff was the owner of certain securities. She had been in the habit of depending on her son, William Henry, to transact business for her and to handle some of her money matters for her. In 1954 William Henry died. A younger son, Ralph, who had been living in California, immediately came to Washington, moved into his mother's house and took up the task of handling some of his mother's affairs.

On June 28, 1954, the son, Ralph D. Henry, and the plaintiff, Sarah E. Henry, jointly leased a safe deposit box at a bank in this city known as the Union Trust Company of the District of Columbia. The contract for the leasing of the safe deposit box was signed jointly by the plaintiff and by the son. The plaintiff testified that her securities from then on were kept in this safe deposit box. Obviously, both the plaintiff and her son had access to the safe deposit box, and the plaintiff impliedly consented to access of this type.

On February 3, 1955 the son arranged to open an account in his mother's name with the defendants' stock brokerage house. The application for opening the account was signed by the plaintiff personally and the application stated that the client's bank was the Union Trust Company.

On November 28, 1955 the plaintiff and her son opened a joint checking account in the Union Trust Company. The signature card in the bank's files was signed both by the plaintiff personally and by the son. Subsequently, on April 14, 1958 the son, Ralph D. Henry, designated his son, that is, the plaintiff's grandson, Ralph S. Henry, as an attorney in fact to sign checks on the account.

In the year 1958, the son from time to time delivered stock certificates belonging to his mother and purporting to have been endorsed in her name, to the defendants with instructions to sell the stock. These certificates had been kept in the safe deposit box to which reference has been made. The defendants sold the certificates, as instructed by the son, from time to time, and made out checks for the proceeds of the sales to the order of the plaintiff, Sarah E. Henry. The endorsements on these checks show that they were deposited either to the account of Sarah E. Henry, or to the joint account heretofore mentioned in the Union Trust Company. The son and grandson drew checks against the joint account for their own purposes.

The foregoing constitute the salient facts on which the rights of the parties depend. This brings us to a consideration of the applicable principles of law.

What is known as apparent authority of an agent or ostensible authority or agency by estoppel, as it is variously called, has been very aptly defined in the Second Edition of the Restatement of the Law on Agency. In Section 27, Chapter 3, it is stated that:

"Apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."

And, again, the Restatement states:

"For apparent authority there is the basic requirement that the principal be responsible for the information which comes to the mind of the third person, similar to the requirement for the creation of authority that the principal be responsible for the information which comes to the agent. Thus, either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief."

The Supreme Court has approved this doctrine and has applied it in Bronson's Executor v. Chappell, 12 Wall. 681, 683, 20 L.Ed. 436. The Court stated:

"Where one, without objection, suffers another to do acts which proceed upon the ground of authority from him, or by his conduct adopts and sanctions such acts after they are done, he will be bound, although no previous authority exists, in all respects as if the requisite power had been given in the most formal manner. If he has justified the belief of a third party that the person assuming to be his agent was authorized to do what was done, it is no answer for him to say that no authority had been given, or that it

did not reach so far, and that the third party had acted upon a mistaken conclusion. He is estopped to take refuge in such a defense. If a loss is to be borne, the author of the error must bear it. If business has been transacted in certain cases it is implied that the like business may be transacted in others."

And, again, the Court says:

"Under such circumstances the presence or absence of authority in point of fact, is immaterial to the rights of third persons whose interests are involved. The seeming and reality are followed by the same consequences. In either case the legal result is the same."

■ In this case, by leasing a safe deposit box jointly with the son, by permitting her securities to be kept in this safe deposit box, and by opening an account with the defendants as well as a joint checking account with the son in the Union Trust Company, the plaintiff, unwittingly perhaps, conferred upon the son apparent or ostensible authority to handle the securities for her. The fact that some of the endorsements on the certificates were clever forgeries does not change the situation.

A case that is practically on all fours, both as to the facts and the law, is the decision of the Supreme Court in National Safe Deposit, Savings & Trust Co. v. Hibbs, 229 U.S. 391, 33 S.Ct. 818, 57 L. Ed. 1241. This case arose in the District of Columbia courts. The facts were very similar to those involved in the case at bar. The plaintiff bank had made a loan to a customer, who deposited with the bank certain stock certificates as collateral security. An employee of the bank, who had been a trusted subordinate for many years, took the certificates out of the bank's vault and delivered them to the defendant stockbrokers, with instructions to sell them. These certificates were sold and the dishonest employee of the bank received a check for the proceeds, which he subsequently cashed. Suit was brought by the bank against the broker for the value of the stolen stock certificates. The Court held that the bank was not entitled to recover, and its decision was affirmed by the Court of Appeals of the District of Columbia and then by the Supreme Court of the United States. In the course of its opinion, the Supreme Court stated (229 U.S. at page 393, 33 S.Ct. at page 819):

"By the custom of banks, brokers and others dealing in stock, which custom was known to the bank, the possession of stock certificates assigned in blank and attested, as were the certificates here in controversy, has been recognized, in the absence of knowledge or cause of suspicion to the contrary, as evidence of ownership or of authority to sell, pledge or otherwise deal with such certificates as the owner might do."

And, again, the Court stated:

"In this case conflicting legal principles are invoked and relied upon. For the defendant in error the familiar principle 'that where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it' is advanced. The plaintiff in error invokes the principle that where the owner of property, such as stock certificates, has lost it by the criminal or fraudulent act of another, the owner not voluntarily or negligently conferring upon such another the indicia of ownership or apparent title, cannot be deprived of his property by the attempted transfer of title to a third person for value, no matter how innocent the purchaser may be of knowledge of the crime or fraud by which the property was acquired."

And then the Court goes on to make the following significant observation:

"Stock certificates are a peculiar kind of property. Although not negotiable paper, strictly speaking, they are the basis of commercial

transactions large and small, and are frequently sold in open market as negotiable securities are."

Finally, the Court says:

"Here one of two innocent persons must suffer and the question at last is, Where shall the loss fall? It is undeniable that the broker obtained the stock certificates, containing all the indicia of ownership and possible of ready transfer, from one who had possession with the bank's consent, and who brought the certificates to him, apparently clothed with the full ownership thereof by all the tests usually applied by business men to gain knowledge upon the subject before making a purchase of such property. On the other hand, the bank, for the legitimate purpose, with confidence in one of its own employees, entrusted the certificates to him, with every evidence of title and transferability upon them. The bank's trusted agent, in gross breach of his duty, whether with technical criminality or not is unimportant, took such certificates, thus authenticated with evidence of title, to one who in the ordinary course of business, sold them to parties who paid full value for them. In such case we think the principles which underlie equitable estoppel place the loss upon him whose misplaced confidence has made the wrong possible."

An expert witness testified in this case that, where a customer brings a stock certificate to a bank or a banking house for sale and that certificate purports to have been endorsed by another customer, the custom in the banking community is to accept such certificate for sale at the direction of the customer bringing it to the bank.

On the undisputed facts it is clear, beyond peradventure of a doubt, that the defendants violated no legal or moral duty and are not under any legal or moral obligation to reimburse the plaintiff for her unfortunate loss, a loss which she suffered through the perfidy of her son and grandson.

In the light of these considerations, the Court will direct a verdict in favor of the defendants.